[No. A081428. First Dist., Div. Three. Dec. 16, 1998.]

ROBERT HOLMES, Plaintiff and Respondent, v.
TERENCE HALLINAN, as District Attorney, etc., Defendant and
Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## Counsel

Louise H. Renne, City Attorney, Vicki A. Clayton and Joseph M. Quinn, Deputy City Attorneys, for Defendant and Appellant.

Peter Aviles and Tiffany H. Wright for Plaintiff and Respondent.

## Opinion

**WALKER, J.**—The District Attorney for the City and County of San Francisco (District Attorney) appeals the trial court's order granting Robert Holmes's petition for a writ of mandate and ordering the District Attorney to reinstate Holmes after the District Attorney fired him for falsifying workers' compensation forms and dishonesty. The trial court found that the District Attorney violated Holmes's due process right to notice and an opportunity to be heard prior to his termination and his right to an administrative appeal under the Public Safety Officers Procedural Bill of Rights Act, and that substantial evidence did not support the District Attorney's decision. The District Attorney contends that the trial court erred in its determinations. We agree, and reverse.

### BACKGROUND

Holmes was a senior investigator with the District Attorney's office and, under state law, he is a peace officer. (Pen. Code, § 830.1.) Beginning on January 13, 1997, Holmes took two weeks off from his job. Assistant Chief Investigator Charles LaMorte, Holmes's supervisor, informed Holmes on January 13, 1997, that he had been transferred to the welfare fraud team. On January 21, 1997, Holmes's doctor placed Holmes on disability status because he injured his back. Subsequently, Holmes submitted workers'

compensation forms stating that he injured his back on January 23, 1997, at work.

On April 7, 1997, the District Attorney informed Holmes by letter that he was scheduled to meet with Andy Ilves, the law office manager, Assistant Deputy District Attorney Debra Hayes, and LaMorte "to discuss" Holmes's workers' compensation claim, among other matters. The letter noted, "As the information obtained during this meeting may lead to disciplinary action, you may bring a representative . . . ." Holmes attended the meeting with his attorney. Hayes informed Holmes that the proceeding was a *Weingarten* meeting,[1] "an investigative meeting," and that Holmes was free to go.

Holmes admitted preparing a workers' compensation document stating that he injured his back "[o]n 23 January, while moving my belongings and cleaning my work area . . . . I saw my Dr. 2/4/97." He stated he made errors in typing the dates of injury and when he saw his doctor on the form, and that he "was going by dates that I had received from Nelson Wong down in personnel . . . ." He stated that the workers' compensation form should have said that he saw his doctor on January 21. Holmes conceded that he completed a second workers' compensation form indicating that he injured himself on January 23. He explained that he took that date off the first workers' compensation document. Holmes denied talking to LaMorte on January 22, 1997, and telling him that he had injured his back while moving his wife's office the previous day. Holmes stated that he first saw his doctor on January 21, 1997, and that he injured his back moving boxes in his office "[t]he previous Thursday[, which] was my last day at work and I believe that was the 17th or the 16th." Holmes at first agreed that his "time-off form," accurately showed that he was off work January 13-17, and January 21-24, but he then stated that the time-off form was inaccurate: "No, I think there's an error there. It [the date of injury] was my last day at the . . . office." Holmes then clarified that the injury occurred on January 16, and, according to his figures and after conferring with counsel, he worked January 13-16 and was off on the 17th. Holmes stated that Megan Costello saw him injure his back, and that he did not injure his back doing anything for his wife's business.

On May 2, Hayes sent a letter to Holmes stating that "[a] conference has been scheduled . . . to discuss a recommendation for disciplinary action," based on the charges of falsifying a workers' compensation application and dishonesty. Holmes's counsel was informed by telephone a few days

---

[1] *NLRB* v. *Weingarten, Inc.* (1975) 420 U.S. 251, 262 [95 S.Ct. 959, 966, 43 L.Ed 171], establishes that a union employee has a right to the presence of a union representative at an investigatory interview that may reasonably lead to disciplinary action.

later that the conference was a *Skelly* hearing[2] and that Holmes could present evidence and argue his defense. Holmes's counsel requested a continuance and "discovery" in the form of documents or reports used to support the decision to hold the *Skelly* hearing.

Hayes rescheduled the hearing and sent Holmes and his attorney a number of documents, including a "report and declaration" by LaMorte.[3] In the report and declaration, LaMorte related that Holmes told him on January 3, 1997, that Holmes wanted two weeks off to help his wife, Jerri, close her office. LaMorte stated that he informed Holmes on January 13 of his new assignment to the welfare fraud unit, and that Holmes was displeased. LaMorte related that Holmes called him on January 22 and said that Holmes had injured his back the previous day while moving Jerri, and that he wanted to change his time-off status to sick leave. A letter from a Dr. Freidman, Holmes's doctor, included in the documents sent to Holmes, stated that Holmes was "temporarily and totally disabled as of 1/21/97." A March 11, 1997, memorandum from Deborah Waterfield, a senior investigator, stated that she talked to Dr. Freidman, who confirmed that the disability date and the date that he saw Holmes was January 21, 1997.

Holmes's counsel, on the day before the scheduled conference, requested more information and documents as "discovery," further requested that various members of the District Attorney's staff be present at the conference and available to testify, informed Hayes that he anticipated calling a number of witnesses, and asked for a continuance. Hayes denied the request to continue the *Skelly* hearing, noting that it had been continued previously at Holmes's counsel's request, and informed counsel that Holmes was not entitled to discovery nor "to call witnesses." Hayes informed counsel that the purpose of the hearing was to respond to the May 2 charges, and that if Holmes was unable to attend, he could respond in writing.

On the day before the scheduled hearing, Holmes submitted a workers' compensation form stating that the date of his back injury was "7-1-94 to 1/9/97 cumulative." Neither Holmes nor his attorney attended the hearing, held on May 21, 1997. Holmes responded to the charges with a letter from his attorney, which stated that Holmes was injured on January 9, 1997, at work, and that Megan Costello saw him lifting heavy boxes on that day. The letter stated that Holmes denied telling LaMorte on January 22 that he

---

[2] *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 215 [124 Cal.Rptr. 14, 539 P.2d 774], requires, before a permanent employee is disciplined, that the employee be given "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline."

[3] The declaration is not signed under penalty of perjury.

injured his back moving his wife's office, and that he did not, in fact, move his wife's business. The letter referred to a report from Dr. Freidman which stated, "In late January, the patient injured his back at work while moving boxes. . . . He was taken off work again at that time, January 21, 1997, and has not returned since." Counsel's letter attributed the "inaccurate" dates of Holmes's injury given in the workers' compensation form and at the April 7 investigative hearing to wrong information provided by Nelsen Wong and to a "series of simple misunderstandings and relatively insignificant mistakes" concerning the date of Holmes's last day in the office before he took time off in January. Holmes's counsel also objected to the lack of a thorough investigation, and the failure to provide full discovery or an evidentiary hearing with sworn testimony.

On June 3, 1997, Chief of Investigations Daniel Addario informed Holmes that, based on the recommendations of LaMorte and Ilves and a review of the investigative findings and other documentary evidence, Addario sustained the charges of falsifying a workers' compensation application and dishonesty. Holmes filed an appeal and a grievance with Chief Deputy Paul Cummins, contending that he was entitled to an evidentiary hearing before a neutral fact finder. Ilves informed Holmes, on Cummins behalf, that he was "inclined to deny . . . Holmes' grievance" in the absence of any new evidence, such as a statement from Megan Costello or Holmes's declaration under oath refuting the charges.

Holmes forwarded a declaration from himself and a sworn statement from Megan Costello to Cummins. Holmes stated in his declaration that he injured his back on the "last day of work, the Thursday following my one week on-call tour of duty in the Officer Involved Shootings Team," at work moving boxes. He opined that Costello witnessed the injury. Holmes also declared that he did not injure his back at home or in connection with his wife's business, and did not tell LaMorte that he did so. He attributed the wrong dates on his workers' compensation forms to misinformation from Nelsen Wong and maintained that he was confused as to the correct date during his testimony at the April 7 investigative hearing. Costello stated in her submission that she was present "on the last day that . . . Holmes moved out of his office," which was also his "last day working in Technical Services at the . . . District Attorney's Office." She stated that she saw Holmes moving boxes with difficulty, and that he "was having trouble" and "grunted" while lifting the boxes. Cummins subsequently affirmed the decision to terminate Holmes and denied his grievance.

Holmes filed a petition for writ of administrative mandamus in superior court, arguing that he was denied procedural due process because he could

not present live testimony at the hearing on his termination and biased fact finders presided over the disciplinary hearing. Holmes also asked the court to reweigh the evidence to determine if the findings supported the weight of the evidence. The trial court granted the petition for writ of mandate, finding that Holmes's due process rights were violated because: (1) he did not receive a hearing before a neutral fact finder, because the same people prosecuting him were also presiding over the hearing; (2) none of the District Attorney's evidence was sworn or subject to cross-examination; and (3) he did not receive any hearing, evidentiary or otherwise, on appeal from his termination decision. The court also found that the charge of "defraud-[ing] his employer by seeking benefits to which he was not entitled" was not supported by "one scintilla of evidence" and that the charge "borders on malicious." The District Attorney appeals the decision.

## DISCUSSION

The District Attorney contends that the trial court erred by finding that Holmes's due process rights were violated because the evidence against Holmes was unsworn and not subject to cross-examination and he did not receive hearings before neutral fact finders. The District Attorney also contends that the trial court erred in determining that Holmes was entitled to an evidentiary hearing in his appeal of the termination decision. Finally, the District Attorney argues that the trial court erred by determining that substantial evidence did not support the District Attorney's decision to fire Holmes. We agree with the District Attorney's contentions, and reverse.

### I. Holmes Was Afforded Due Process

█ The parties agree that Holmes was an at-will employee, terminable without cause. As such, he had no legitimate due process right in continued employment. (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 578 [92 S.Ct. 2701, 2709-2710, 33 L.Ed.2d 548] (*Roth*); *Murden* v. *County of Sacramento* (1984) 160 Cal.App.3d 302, 307-308 [206 Cal.Rptr. 699] (*Murden*).) However, an at-will employee's liberty interests are deprived when his discharge is accompanied by charges "that might seriously damage his standing and associations in his community" or "impose[] on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." (*Roth, supra,* 408 U.S. at p. 573 [92 S.Ct. at p. 2707]; *Murden, supra,* 160 Cal.App.3d at p. 308.) Where a deprivation of a liberty interest occurs the employee's "remedy mandated by the Due Process Clause of the Fourteenth Amendment is 'an opportunity to refute the charge [and] . . . to clear his name.' [Citation.]" (*Codd* v. *Velger* (1977) 429 U.S. 624, 627 [97 S.Ct. 882, 883-884, 51 L.Ed.2d 92]; *Lubey* v. *City and County of San*

*Francisco* (1979) 98 Cal.App.3d 340, 346 [159 Cal.Rptr. 440].) The employee is entitled to notice and a hearing appropriate to the nature of the case. (*Roth*, *supra*, 408 U.S. at p. 570, fn. 7 [92 S.Ct. at p. 2705]; *Murden*, *supra*, 160 Cal.App.3d at p. 309.)

The balance of three factors determine what process is constitutionally due: The private interest affected by the official action, the risk of an erroneous deprivation of the interest through the procedure used and the probable value of other or additional procedural safeguards, and the government's interest. (*Mathews* v. *Eldridge* (1976) 424 U.S. 319, 348 [96 S.Ct. 893, 909, 47 L.Ed.2d 18] (*Mathews*).) Although there is scant United States Supreme Court authority for what is required under the due process clause before an at-will public employee may be discharged because of allegations of wrongdoing, the court has considered what is required before a *tenured* public employee may be discharged. A tenured public employee is "entitled to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing." (*Gilbert* v. *Homar* (1997) 520 U.S. 924, 929 [117 S.Ct. 1807, 1811, 138 L.Ed.2d 120, 126] (*Gilbert*).) The court has never held that an employee, tenured or otherwise, must be given a full evidentiary hearing before or after being terminated. The court has observed that "differences in the origin and function of administrative agencies 'preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts.' [Citation.] The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." (*Mathews*, *supra*, 424 U.S. at p. 348 [96 S.Ct. at p. 909].)

■ Our Courts of Appeal have held that an at-will peace officer discharged because of charges of impropriety or wrongdoing is not entitled to an evidentiary hearing complete with the presentation of witness testimony under oath and the right to cross-examination. In *Murden*, *supra*, 160 Cal.App.3d at pages 311-312, the court held that the petitioner was not entitled to a trial-type evidentiary hearing because the government's interest outweighed the threatened liberty interest, and an evidentiary hearing would not have made a difference. (See *Mathews*, *supra*, 424 U.S. at pp. 347-348 [96 S.Ct. at pp. 908-909].) In *Binkley* v. *City of Long Beach* (1993) 16 Cal.App.4th 1795, 1809 [20 Cal.Rptr.2d 903], the court found no authority for the proposition that due process requires the opportunity for the confrontation of witnesses at a trial-type evidentiary hearing. "There is, however, authority supporting the position . . . that there is no right of cross-examination at a name-clearing hearing. (*Murden*, *supra*, 160 Cal.App.3d at p. 311 . . . ; *Mathews* v. *Eldridge*, *supra*, 424 U.S. at p. 348 . . . .)" (*Ibid.*)

At stake in the proceedings against Holmes was his interest in remaining free of charges that impugn his character and impair his freedom to obtain employment. (*Binkley* v. *City of Long Beach, supra*, 16 Cal.App.4th at p. 1808; *Murden, supra*, 160 Cal.App.3d at p. 311.) Holmes portrays his threatened interest more dramatically, stating that he had been "charged with a felony" and threatened with criminal prosecution. The fact is that he was never charged with a felony.[4] Holmes's threatened interest is no different than those of any other employee fired under a cloud of wrongdoing. Even though this interest is of great weight, "so, too, is the government's interest in terminating law enforcement officers who are of questionable moral character, and in doing so in an expeditious, efficient, and financially unburdensome manner." (*Murden, supra*, 160 Cal.App.3d at p. 311; see *Gilbert, supra*, 520 U.S. at pp. 932-933 [117 S.Ct. at p. 1813, 138 L.Ed.2d at p. 126].)

The most important factor in our analysis is the risk of erroneous deprivation under the procedures used and the likely value of additional procedures. (See *Gilbert, supra*, 520 U.S. at pp. 932-933 [117 S.Ct. at p. 1813, 138 L.Ed.2d at p. 126].) The charges against Holmes revolved around his credibility; indeed, his dishonesty was the basis for the charges against him. The resolution of factual disputes and credibility determinations in the absence of a hearing will often create a risk that a liberty interest will be erroneously deprived. A hearing, in order for Holmes to provide his side of the story and invoke the discretion of the decisionmaker, was therefore necessary. (*Cleveland Board of Education* v. *Loudermill* (1985) 470 U.S. 532, 543-544 [105 S.Ct. 1487, 1493-1495, 84 L.Ed.2d 494] (*Loudermill*).) Because Holmes's credibility was at issue, due process required Holmes's presence at a hearing, so the decisionmaker could decide for him- or herself whether Holmes's story was believable. Holmes, however, was given the opportunity to attend the May 21 name-clearing hearing to present his side of the story, but he did not take advantage of that opportunity. As for the other evidence against Holmes, there is no indication that LaMorte had a motive to lie or that he was unsure about what Holmes told him on January 22. There was not, therefore, a significant risk of error in the District Attorney considering his written, unsworn statement. The other significant evidence against Holmes was documentary, and the submission of that evidence without live testimony risked no erroneous outcome.

Holmes argues that the trial court's ruling is correct because he should have been provided with an opportunity to present live testimony from his

---

[4]The District Attorney's office referred the decision to prosecute Holmes for misstatements on his workers' compensation forms to the state Attorney General on May 8, 1997. The record does not indicate that the Attorney General took any action to prosecute Holmes.

witnesses and cross-examine the District Attorney's witnesses. Holmes casts his argument in terms of the District Attorney refusing to consider his evidence, but the reality is that Holmes did not attempt to submit any compelling evidence. He offered no statements or declarations, sworn or otherwise (except for his and Costello's, submitted in his appeal *after* his hearing), and he does not indicate how the live testimony of witnesses, with the concomitant consumption of time and resources, would have enhanced the trustworthiness of the outcome. We hold that there was no requirement that the hearing include live witnesses or the ability to cross-examine the District Attorney's witnesses. (*Mathews, supra,* 424 U.S. at p. 348 [96 S.Ct. at p. 909].) It was enough that Holmes had the opportunity to present his side of the story at the hearing and present written evidence. Holmes's failure to take full advantage of his due process rights does not diminish the fact that he received the process he was due.[5]

We also find no support for the trial court's finding that Holmes did not receive a hearing before a neutral fact finder. "The combination of adjudicative and investigative functions, without more, does not offend due process. (*Withrow* v. *Larkin* [(1975)] 421 U.S. [35,] 47 . . . .)" (*Binkley* v. *City of Long Beach, supra,* 16 Cal.App.4th at p. 1811.) The trial court relied on nothing more than a combination of investigative and adjudicative functions performed by those involved in the May 21 name-clearing hearing to find that the fact finders were not neutral. This was error. (*Ibid.*)

Holmes makes several other arguments in support of the trial court's ruling, which we find have no merit. First, he contends that he was given no notice of allegations made by Deborah Waterfield that Holmes told her that he hurt his back at home. Waterfield executed a declaration relating her conversation with Holmes on August 4, 1997, *after* the District Attorney affirmed the decision to dismiss Holmes. Moreover, the record is clear that Waterfield's allegations played no part in the decision to fire Holmes. Holmes was therefore not entitled to notice of Waterfield's allegations.[6]

Second, Holmes argues that the District Attorney failed to investigate the allegations against him properly. Holmes cites no authority for the proposition that his employer had a duty under the due process clause to mount any

---

[5]Holmes claims that the District Attorney should be estopped from contending that live testimony was necessary at the May 21 name-clearing hearing because the District Attorney repeatedly referred to the hearing as a *Skelly* hearing. Although Hayes and others mistakenly referred to the name-clearing hearing as a *Skelly* hearing, no one ever promised Holmes that he would be able to call witnesses. He was specifically told he could not present witness testimony.

[6]For reasons known only to the District Attorney, the allegations contained in Waterfield's August 4, 1997, declaration were revealed both in the trial court and in this appeal, as if the allegations had any relevance to the proceedings. They do not. The record is clear that Waterfield's allegations concerning what Holmes told her about his back injury were not used in the decision to fire Holmes.

investigation, much less a proper one. On the other hand, Holmes was never prevented from conducting his own investigation and interviewing witnesses, and he was given ample opportunity to present evidence in response to the allegations against him. (See *Binkley* v. *City of Long Beach, supra*, 16 Cal.App.4th at p. 1810.)

Third, and finally, Holmes argues that he was denied "discovery." We have uncovered no authority for the proposition that Holmes was entitled to discovery before he was terminated. Holmes was given notice of the allegations against him and the evidence underlying the allegations. He was entitled to nothing more. (*Loudermill, supra*, 470 U.S. at p. 544 [105 S.Ct. at pp. 1494-1495].) The trial court erred in its determination that Holmes's due process rights were violated.

## II. *Evidentiary Hearing on Appeal Not Required Under Government Code Section 3304**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. *Substantial Evidence Upholds District Attorney's Decision*

██ The trial court found no evidence supporting the District Attorney's decision to fire Holmes. The District Attorney claims that the trial court erred. We agree.

██ In our review of the District Attorney's decision on a petition for administrative mandamus, ". . . we stand in the same shoes as the trial court, applying the substantial evidence rule." (*Kuhn* v. *Department of General Services* (1994) 22 Cal.App.4th 1627, 1632 [29 Cal.Rptr.2d 191] (*Kuhn*).) "Absent proof to the contrary, it is to be presumed the findings of the administrative agency are correct and supported by substantial evidence [citation] and that the agency performed its duties as required by law [citation]." (*Lee* v. *Board of Civil Service Comrs.* (1990) 221 Cal.App.3d 103, 108 [270 Cal.Rptr. 47] (*Lee*).) "[W]e must examine all relevant evidence in the entire record, considering both the evidence that supports the administrative decision and the evidence against it, in order to determine whether or not the agency decision is supported by 'substantial evidence.' [Citations.] For this purpose, '. . . substantial evidence has been defined in two ways: first, as evidence of " ' "ponderable legal significance . . . reasonable in nature, credible, and of solid value" ' " [citation]; and second, as " 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion' " [citation].' " (*Desmond* v. *County of Contra Costa*

---

*See footnote, *ante*, page 1523.

(1993) 21 Cal.App.4th 330, 335 [25 Cal.Rptr.2d 842] (*Desmond*).) We resolve all explicit conflicts in the evidence in favor of the District Attorney. (*Kuhn, supra,* 22 Cal.App.4th at p. 1632.) Holmes has the burden "to demonstrate that the administrative proceedings were unfair or constituted an abuse of discretion" or that no substantial evidence supports the decision. (*Lee, supra,* 221 Cal.App.3d at p. 108; see also *Desmond, supra,* 21 Cal.App.4th at pp. 335-336.)

 The District Attorney found that Holmes made false statements on a workers' compensation form and was dishonest with his supervisor. In support of the findings, the District Attorney had the following information and evidence. LaMorte signed a statement saying that Holmes told him on January 22, 1997, that Holmes injured his back at home on the previous day. Holmes testified at the April 7, 1997, hearing that he injured his back at work, on January 16 or 17, 1997. A note from Holmes's doctor stated that the date of disability was January 21, 1997, which date was confirmed by Waterfield. A report from Holmes's doctor stated that Holmes reported that he injured his back at work in "late January." Holmes submitted workers' compensation forms stating that he injured his back on January 23, 1997. The day before the scheduled name-clearing hearing, Holmes submitted a workers' compensation form reporting the date of his injury as January 9, 1997.

From the evidence, the District Attorney could reasonably conclude that Holmes falsely stated to his supervisor and on workers' compensation forms that he injured his back at work on January 23, January 16, or January 9, after telling his supervisor that he injured his back at home on January 21. Holmes is correct that he provided evidence or alternate theories supporting his claim that he did not tell LaMorte that he injured his back at home, and was confused or misled into claiming the dates of January 16 and January 23 as the dates of injury. Yet, substantial evidence supported the District Attorney's theory that Holmes lied about when and where he injured himself, and the evidence was of " '. . . " ' "ponderable legal significance . . . reasonable in nature, credible, and of solid value." ' " . . .' " (*Desmond, supra,* 21 Cal.App.4th at p. 335.)

Engaging in a reweighing of the evidence, which is inappropriate for a review under the substantial evidence standard, the trial court credits as true, to the exclusion of other contrary evidence, Holmes's theories and evidence. For instance, the trial court asserts that sworn declarations by Holmes and Costello establish that he strained his back at work on January 9, 1997. Holmes does state that he injured his back at work in his declaration, but Costello does not say anything about witnessing Holmes injure his back. She

says she saw him struggle and "grunt." Neither she nor Holmes pinpoints the date to which they refer. Although one could conclude that they refer to January 9, this is by no means the only reasonable inference from their declarations. Furthermore, even if both her and Holmes's declarations are credited as true, this evidence is not inconsistent with the theory that Holmes made false statements on his workers' compensation forms and to his supervisor.

The trial court also labeled the January 23 date on the workers' compensation form a "mistake" and asserted that Holmes was "clearly confused as to the precise dates he worked" at the April 7, 1997, hearing. To the contrary, LaMorte's statement establishes that Holmes presented the workers' compensation form to him which noted a different place and date than Holmes previously told him. Both the trial court and Holmes assume that LaMorte's unsworn statement was unbelievable because it was contradicted by Holmes's sworn statement. The District Attorney was not required to credit Holmes's sworn statement, particularly when Holmes provided contradictory dates for his injury at the April 7 hearing and documents from Holmes's doctor credibly establish an injury date of January 21, corroborating LaMorte's statement. The District Attorney was permitted to consider both the submission of Holmes's sworn statement late in the proceedings and the fact that he opted to respond in writing rather than in person to explain his actions at the name-clearing hearing.[9] Contrary to the trial court's interpretation, Holmes was not "clearly confused" about the date of his injury at the April 7 investigative hearing. Even after he examined his own time-off form stating that he was not at work on January 16, Holmes continued to assert that he injured himself that day at work.

The trial court also faults the District Attorney's "lack of a coherent theory of fraud." Neither the trial court nor Holmes explains why the District Attorney must establish Holmes's motive to lie or falsify his workers' compensation forms. We do not agree with the trial court that "it boggles the mind" that Holmes would try to lie about the date and place of his injury. It seems entirely plausible and consistent with the evidence that Holmes first crudely attempted to submit a workers' compensation form to his supervisor falsely contending that he injured himself at work, and then constructed a web of lies that does not entirely make sense.

Because substantial evidence supports the District Attorney's findings of falsifying workers' compensation forms and dishonesty, we find no abuse of

---

[9]In a similar vein, Holmes asserts that his evidence concerning the mistaken dates on the workers' compensation forms is "uncontroverted." Leaving aside LaMorte's statements, which effectively controvert his evidence, Holmes fails to realize that the District Attorney was not required to credit or believe Holmes's explanation.

discretion in its decision to fire Holmes. (*Desmond, supra*, 21 Cal.App.4th at pp. 335-336; *Lee, supra*, 221 Cal.App.3d at p. 108.) The trial court erred by granting the petition.

Reversed, with directions to deny the petition for writ of administrative mandamus. The parties shall bear their own costs on appeal.

Phelan, P. J., and Parrilli, J., concurred.